UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| CONNIE R. MITCHELL, | |
| Plaintiff, | **COMPLAINT** |
| v. | Civil Action No.: 5:21-cv-382 |
| ATI INDUSTRIAL AUTOMATION, INC., | Jury Trial Demanded |
| Defendant. | |

NOW COMES Plaintiff, Connie R. Mitchell, by and through undersigned counsel, and complains against Defendant ATI Industrial Automation, Inc. as follows:

## INTRODUCTION AND NATURE OF THE CASE

Ms. Mitchell brings this action against Defendant ATI Industrial Automation, Inc. ("Defendant" or the "Company"). Ms. Mitchell alleges herein discriminatory hiring practices on the part of Defendant on the basis of race, sex and gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Civil Rights Act of 1991, 42 U.S.C. § 1981. Ms. Mitchell also brings this action against Defendant for violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* Finally, Ms. Mitchell alleges retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Ms. Mitchell seeks all available remedies including but not limited to, compensatory, punitive, and liquidated damages, as well as available relief pursuant to 42 U.S.C. § 2000e-5(f)-(k), 42 U.S.C. § 1981a, 29 U.S.C. § 626(b) and as otherwise authorized pursuant to state and federal law.

## JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction over this action pursuant to 2 U.S.C. § 1331, as the claims for relief asserted herein arises under federal law, and under 28 U.S.C.

1

1343(a)(4), as the claims herein seek relief under acts of Congress providing for the protection of civil rights.

2.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

3.     Plaintiff Connie R. Mitchell ("Ms. Mitchell") is a citizen and resident of Franklin County, North Carolina. Ms. Mitchell, a 41-year-old, African American female, was employed by Defendant from May 2019 through November 23, 2020. At all times relevant hereto, Ms. Mitchell constituted an "employee" pursuant to all applicable statutes.

4.     Defendant is a domestic corporation organized and existing under the laws of the State of North Carolina with its principal office located at 1031 Goodworth Drive, Apex, NC 27539. At all times relevant hereto, Defendant continuously employed at least 20 employees.

5.     At all relevant times, Defendant has continuously constituted an employer engaged in an industry affecting commerce in accordance with sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h) and pursuant to the ADEA.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.     Ms. Mitchell filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 29, 2020, alleging discrimination on the basis of age, race and sex.

7.     On June 22, 2021, Ms. Mitchell requested a Right to Sue Letter. The EEOC issued Ms. Mitchell's Notice of Right to Sue on June 24, 2021.

8.     Ms. Mitchell complied with all deadlines related to the investigation of her formal administrative complaint.

9.      All conditions precedent to the institution of this lawsuit have been fulfilled.

## FACTUAL ALLEGATIONS

10.     Defendant develops and manufactures robotic accessories and tools for distribution to clients across the United States. In fact, Defendant holds itself out as the "world-leading engineering-based developer of robotic accessories and robot arm tooling."

11.     Defendant hired Ms. Mitchell as a Mechanical Assembler at the Company's Apex, North Carolina facility in May 2019. As a Mechanical Assembler, Ms. Mitchell was responsible for assembling various mechanical tooling components on an assembly line, assisting in manufacturing tool changers, and testing and troubleshooting tooling devices once they were assembled.   In August 2020, Ms. Mitchell was the only female working on Defendant's assembly line.

12.     On August 6, 2020, Heather Beal ("Beal"), Defendant's Human Resources Generalist, emailed a notice of job opening for a Calibration Technician in Defendant's Calibration Lab. Upon information and belief, the position was open only to internal applicants. Calibration Technicians were responsible for assembling sensor systems and components and testing and calibrating the assembled sensor systems. Required skills and abilities included but were not limited to: (1) electro-mechanical skills, (2) hands-on experience with calibrating measurement devices, (3) an ability to follow established procedures, (4) ability to lift 50-pound weights, (5) computer skills, and (6) trouble-shooting skills. At the time of the posting, no females worked in the Calibration Lab.

13.     While working as a Mechanical Assembler, Ms. Mitchell acquired and honed each of the requisite skills listed in the job posting. On a daily basis, Ms. Mitchell assembled tools,

followed established Company protocols, tested the assembled product, and would trouble-shoot any issues found during quality control testing.

14.     Ms. Mitchell expressed her interest in the Calibration Technician position to Melvin Wells ("Wells"), the Team Leader of the Calibration Lab. Wells indicated that he was unsure if Ms. Mitchell had the physical ability to meet the position's 50-pound lifting requirement. Wells then asked Ms. Mitchell to lift weights totaling 50-pounds in the Calibration Lab. Ms. Mitchell completed Wells' "strength test" without issue. Upon information and belief, Wells, nor any other employee, required male applicants to perform demonstrations of strength.

15.     Within hours of reviewing the job posting (and passing Wells' "strength test"), Ms. Mitchell applied for Calibration Technician by hand-delivering her resume to Beal.

16.     On August 19, 2020, Ms. Mitchell was interviewed for the Calibration Technician position by Wells, Joe Feltenberger ("Feltenberger"), and Brad Horton. The interview was notably informal and consisted primarily of Feltenberger, the Forced Torque Supervisor in the Company's Calibration Lab, explaining the various types of work Ms. Mitchell could expect if she was selected for the position. During the interview, Feltenberger remarked that Ms. Mitchell had "extensive experience in manufacturing" and asked Ms. Mitchell very few questions.

17.     On August 27, 2020, Feltenberger notified Ms. Mitchell that he was still reviewing applications for the Calibration Technician position, but he would advise her of the final decision soon. As the Forced Torque Supervisor, Feltenberger would supervise the person hired for the Calibration Technician position.

18.     On August 31, 2020, Feltenberger informed Ms. Mitchell that Defendant had decided to hire Mark Sinning ("Sinning") for the Calibration Technician position. Though she was not hired, Feltenberger offered to train Ms. Mitchell on the "skills necessary to perform the duties

of a Calibration Technician," without compensation. Feltenberger also acknowledged that he did not know if or when another Calibration Technician position would be created.

19.    Upon information and belief, Feltenberger expected Ms. Mitchell to clock out during the middle of her shift—when she would have been otherwise compensated for her time—to join him in the Calibration Lab for unpaid training.  This proposal was highly unusual for the Company and not in accordance with any policy or procedure. Feltenberger also told Ms. Mitchell to "stay out of trouble" as the position (which did not exist) could be rescinded.

20.    Sinning—a white male in his late twenties—lacked the qualifications, proficiencies, and work experience of Ms. Mitchell. Prior to being hired for the Calibration Technician position, Sinning worked as a Shipping Specialist in Defendant's Shipping and Receiving department. As a Shipping Specialist, Sinning was responsible for packing and shipping assembled robotic parts and transferring inventory from the stockroom to fill orders. Prior to working for Defendant, Sinning had pursued a career as a professional golfer.

21.    Upon information and belief, at the time he was hired for the Calibration Technician position, Sinning had no manufacturing experience, nor did he possess the requisite skills set forth in the job posting.

22.    On September 2, 2020, Ms. Mitchell emailed Beal regarding Defendant's decision not to hire her for the Calibration Technician position. Ms. Mitchell stated that she believed "pure discrimination" had occurred during the hiring process and she that she had not been given a "fair shot." Ms. Mitchell also said that she believed Feltenberger's offer to train her for a nonexistent position was "a way to cover things up." Beal responded and indicated that she would speak to John Snead ("Snead"), Defendant's Production Manager.

5

23.     On September 3, 2020, Snead approached Ms. Mitchell at her workstation and said that it "stood out" to him that she believed she had been discriminated against. Snead told Ms. Mitchell that Sinning was offered the position because his "interview skills were a bit better."

24.     A few days after her exchange with Snead on the assembly line, Ms. Mitchell received an electronic invitation to attend a meeting with Feltenberger on September 10, 2020. The agenda for the meeting was "[j]ust a general meet and discuss to get to know one another" and to "share information on the transition." Ms. Mitchell was surprised by the meeting request because she had not participated in any such meetings previously, nor was aware of any coworkers who were "invited" to attend such a meeting. Ms. Mitchell was very anxious about the meeting and worried that it was an attempt to intimidate her or convince her to not proceed with any further regarding her internal discrimination complaints.

25.     On September 10, 2020, Feltenberger and Ms. Mitchell met for approximately thirty (30) minutes, during which he informed her that that he wanted to meet every week because he did not want Ms. Mitchell "to start thinking crazy things."

26.     On September 16, 2020, Ms. Mitchell received another electronic meeting invitation. This time, Rob Eller ("Eller"), Ms. Mitchell's direct supervisor, was also invited to the meeting. Ms. Mitchell contacted Beal and expressed her concerns regarding these meetings. Ms. Mitchell told Beal that she felt intimidated and was concerned about attending. Beal told Ms. Mitchell she should decline the meeting request if she felt intimidated. Based on Beal's advice, Ms. Mitchell declined the meeting invitation. Ms. Mitchell also emailed Eller to inform him that the weekly meetings made her feel uncomfortable because she was the only employee being asked to meet alone with Company supervisors for the purpose of preventing her from "thinking crazy."

27.     On September 17, 2020, Beal approached Ms. Mitchell while she was on the assembly line and asked her to meet in a conference room. Beal began questioning Ms. Mitchell why she felt she had been discriminated against. Ms. Mitchell told Beal that she believed Defendant had a "habit of putting younger white males in the cal lab" and "promoting them first."

28.     During the meeting, Beal informed Ms. Mitchell that she had drafted an offer letter for a new Calibration Technician position, but that Defendant had not been able to give it to her because she had cancelled the September 16th meeting. Ms. Mitchell found this odd since Feltenberger had previously stated that Defendant did not know if, let alone when, it may hire another Calibration Technician.

29.     Shortly after Defendant selected Sinning for the Calibration Technician position, Ms. Mitchell received a call from the Company's former HR Manager. The former HR manager informed Ms. Mitchell that she had, as the then-acting HR Manager, instructed Defendant to hire Ms. Mitchell for the position because she was the most qualified candidate. The former HR manager also stated that she was not surprised Defendant selected Sinning because of Defendant's history of discriminatory hiring practices. Upon information and belief, Defendant routinely hires younger, underqualified white male for positions rather than applicants of different ages, races, and/or the opposite sex who are be better qualified for the applicable position.

30.     As a result of Defendant's discriminatory hiring practices and being forced to attend meetings with supervisors and HR, wherein she felt intimidated, Ms. Mitchell began to experience significant anxiety. On September 24, 2020, Ms. Mitchell sought counseling and therapeutic services through Duke Health.

31.    As a further direct and proximate result of Defendant's discriminatory and intimidating conduct, Ms. Mitchell was placed on leave pursuant to the Family Medical Leave Act ("FMLA") from on or about September 24, 2020 through October 26, 2020.

32.    Following the expiration of her FMLA leave period, Ms. Mitchell returned to work and was turned away by Defendant because she did not have a release from care note. The next day, Ms. Mitchell returned with requisite work note and returned to her position on the assembly line.

33.    On November 23, 2020, Ms. Mitchell sent a letter of resignation from her position with Defendant on the advice of her healthcare professionals, effective November 27, 2020.

34.    As is set forth herein, Defendant intentionally discriminated against Ms. Mitchell because of her race, sex, and age in violation of Title VII, 42 U.S.C. §1981, ADEA and North Carolina law.

35.    As a direct and proximate result of Defendant's unlawful discrimination, Ms. Mitchell suffered and continues to suffer dagames. Defendant is liable to Ms. Mitchell for all damages and remedies available to her under the law, including but not limited to, front pay, back pay, compensatory damages, punitive damages, costs, and attorney's fees.

## FIRST CLAIM FOR RELIEF
### Racial Discrimination in Violation of Title VII
### of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1991, 42 U.S.C. § 1981

36.    Plaintiff reiterates and realleges each and every paragraph above and incorporates each hereto as if set forth fully herein.

37.    As an African American, Ms. Mitchell is a member of a protected class, and thus, satisfies the threshold requirement.

38. On August 6, 2020, Ms. Mitchell applied for the Calibration Technician position within a matter of hours after Beal provided notice of the open position.

39. Ms. Mitchell was more than qualified for the Calibration Technician position. Prior to joining the Company, Ms. Mitchell had worked in various manufacturing jobs as a temporary employee. Ms. Mitchell had worked as a Mechanical Assembler for Defendant for over a year prior to applying for the Calibration Technician position. As a Mechanical Assembler, Ms. Mitchell was responsible for _assembling_ tools, _testing_ the assembled product, and _troubleshooting_ issues discovered during the quality control testing. Further, in her role as a Mechanical Assembler, Ms. Mitchell had become very knowledgeable regarding the Company's products, as well as its policies and procedures. In fact, when Ms. Mitchell began working for Defendant she was a temporary employee; however, prior to the expiration of her contract, Defendant hired her as a full-time employee because the Company "could not afford to lose her." Ms. Mitchell was never disciplined, nor did she receive negative feedback regarding her work.

40. Similarly, if hired for the Calibration Technician position, Ms. Mitchell would have been responsible for _assembling_ systems and components and _testing_ the assembled systems. Additionally, the job posting indicated that candidates for the Calibration Technician Position must possess, among others, _troubleshooting_ skills. Admittedly, Defendant acknowledged Ms. Mitchell's "extensive manufacturing experience." Ms. Mitchell met (and exceeded) the requisite qualifications for the Calibration Technician position.

41. The circumstances under which Plaintiff was not hired for the Calibration Technician raise more than an inference of racial discrimination. First, Defendant hired Sinning, a white applicant with no prior manufacturing experience rather than Ms. Mitchell, a black applicant with "extensive manufacturing experience." Additionally, a former Company HR manager had,

prior to her departure from the Company, instructed Defendant to hire Ms. Mitchell for the Calibration Technician position because she was the most qualified candidate.

42.     The only explanation Defendant provided Ms. Mitchell regarding its decision to hire Sinning over her was because he performed a "bit better" in his interview. This explanation is wholly pretextual. During her interview, Defendant's supervisory employees did not ask Ms. Mitchell any substantive questions, let alone provide her the opportunity to present her "interview skills." Instead, Feltenberger used the interview as an opportunity to describe the position's workload, of which Ms. Mitchell was well-aware.

43.     Defendant treated Sinning, a member outside of Ms. Mitchell's protected class of race more favorably when it offered him the Calibration Technician position. Specifically, Defendant hired a white applicant, even though Ms. Mitchell, a black applicant, possessed superior knowledge of the Company's products and its assembly, manufacturing, testing and trouble-shooting procedures/protocols.

44.     In hiring Sinning, Defendant engaged in unlawful employment practices in violation of Title VII, 42 U.S.C. § 2000e-2 and 42 U.S.C. § 1981. Specifically, Defendant, through its supervisory employees, discriminated against Ms. Mitchell by hiring a less qualified white applicant for the Calibration Technician position to which she also had applied. Further, Defendant attempted to cover up its unlawful conduct by offering to train Ms. Mitchell, without compensation, for a "second" Calibration Technician position that may never have come to fruition.

45.     By hiring Sinning over Ms. Mitchell, lying to her, and attempting to hide the intent behind its actions, Defendant, through its supervisory employees, acted intentionally, maliciously,

and with reckless indifference to Ms. Mitchell's federally protected right to be free from racial discrimination.

46.    Defendant's conduct, by and through its supervisory employees, deprived Ms. Mitchell of equal employment because of her race.

47.    Based on its conduct as set forth herein, it was reasonably foreseeable to Defendant that Ms. Mitchell would incur significant damages, including but not limited to lost wages, as a result of the mental anguish and emotional harm Defendant caused as a direct and proximate result of its unlawful hiring decision.

48.    As a direct and proximate result of Defendant's violations of Title VII and 42 U.S.C. § 1981 as described herein, Ms. Mitchell has suffered significant mental, emotional and financial damages, including lost wages, lost benefits, emotional distress, and other non-pecuniary damages.

49.    As a result of Defendant's acts and omissions as set forth herein, Defendant is liable to Ms. Mitchell for all damages sustained due to Defendant's unlawful hiring decision and is entitled to all remedies available to her authorized by law including, but not limited to, front pay, back pay, compensatory damages, punitive damages, costs, attorneys' fees, etc.

**SECOND CLAIM FOR RELIEF**
**Gender Discrimination in Violation of Title VII**
**of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1991,**
**42 U.S.C. § 1981a**

50.    Ms. Mitchell reiterates and realleges each and every paragraph above as if set forth fully herein.

51.    As a female, Ms. Mitchell is a member of a protected class and thus satisfies the threshold requirement.

52.     On August 6, 2020, Ms. Mitchell applied for the Calibration Technician position within a matter of hours after Beal provided notice of the open position.

53.     Ms. Mitchell was more than qualified for the Calibration Technician position. Prior to joining the Company, Ms. Mitchell had worked in various manufacturing jobs as a temporary employee. Ms. Mitchell had worked as a Mechanical Assembler for Defendant for over a year prior to applying for the Calibration Technician position. As a Mechanical Assembler, Ms. Mitchell was responsible for *assembling* tools, *testing* the assembled product, and troubleshooting issues discovered during the quality control testing.  Further, in her role as a Mechanical Assembler, Ms. Mitchell had become very knowledgeable regarding the Company's products, as well as its policies and procedures. In fact, when Ms. Mitchell began working for Defendant, she was a temporary employee; however, prior to the expiration of her contract, Defendant hired her as a full-time employee because the Company "could not afford to lose her." Ms. Mitchell was never disciplined, nor did she receive negative feedback regarding her work.

54.     Similarly, if hired for the Calibration Technician position, Ms. Mitchell would have been responsible for *assembling* systems and components and *testing* the assembled systems. Additionally, the job posting indicated that candidates for the Calibration Technician Position must possess, among others, *troubleshooting* skills. Admittedly, Defendant acknowledged Ms. Mitchell's "extensive manufacturing experience." Ms. Mitchell met (and exceeded) the requisite qualifications for the Calibration Technician position.

55.     Ms. Mitchell was not hired for the Calibration Technician position under circumstances that raise more than an inference of gender discrimination. First, when Ms. Mitchell expressed interest in the position to Wells, the Calibration Lab's Team Leader, he asked her to prove she could meet the positions physical requirements by lifting 50 pounds in front of him.

Upon information, Defendant did not require male applicants to a similar "strength test." Additionally, Defendant did not employ any females in the Calibration Lab.

56.     Further, Defendant hired Sinning, a male applicant with no prior manufacturing experience rather than Ms. Mitchell, a female applicant with "extensive manufacturing experience." Additionally, a former Company HR manager had, prior to her departure from the Company, instructed Defendant to hire Ms. Mitchell for the Calibration Technician position because she was the most qualified candidate. Based on the foregoing, it is clear that the only reason Defendant chose not to hire the "most qualified candidate" is because that candidate was a female.

57.     The only explanation Defendant provided Ms. Mitchell regarding its decision to hire Sinning over her was because he performed a "bit better" in his interview. This explanation is wholly pretextual. During her interview, Defendant's supervisory employees did not ask Ms. Mitchell any substantive questions, let alone provide her the opportunity to present her "interview skills." Instead, Feltenberger used the interview as an opportunity to describe the position's workload, of which Ms. Mitchell was well-aware.

58.     Defendant treated Sinning, a member outside of Ms. Mitchell's protected class of gender more favorably when it offered him the Calibration Technician position. Specifically, Defendant hired a male applicant, even though Ms. Mitchell, a female applicant, possessed superior knowledge of the Company's products and its assembly, manufacturing, testing and trouble-shooting procedures/protocols.

59.     Additionally, at all times relevant to this Complaint, Defendant employed no women in its Calibration Lab and, when Ms. Mitchell applied for the Calibration Technician

position, Defendant's supervisory employee required her to perform a physical display of strength which male applicants were not required to perform.

60.     In hiring Sinning, Defendant engaged in unlawful employment practices in violation of Title VII, 42 U.S.C. § 2000e-2 and 42 U.S.C. § 1981. Specifically, Defendant, through its supervisory employees, discriminated against Ms. Mitchell by hiring a less qualified male applicant for the Calibration Technician position to which she also had applied. Further, Defendant attempted to cover up its unlawful conduct by offering to train Ms. Mitchell, without compensation, for a "second" Calibration Technician position that may never have come to fruition.

61.     By hiring Sinning over Ms. Mitchell, lying to her, and attempting to hide the intent behind its actions, Defendant, through its supervisory employees, acted intentionally, maliciously, and with reckless indifference to Ms. Mitchell's federally protected right to be free from racial discrimination.

62.     Defendant's conduct, by and through its supervisory employees, deprived Ms. Mitchell of equal employment because of her gender.

63.     Based on its conduct as set forth herein, it was reasonably foreseeable to Defendant that Ms. Mitchell would incur significant damages, including but not limited to lost wages, as a result of the mental anguish and emotional harm Defendant caused as a direct and proximate result of its unlawful hiring decision.

64.     As a direct and proximate result of Defendant's violations of Title VII and 42 U.S.C. § 1981a as described herein, Ms. Mitchell has suffered significant mental, emotional and financial damages, including lost wages, lost benefits, emotional distress, and other non-pecuniary damages.

65.     As a result of Defendant's acts and omissions as set forth herein, Defendant is liable to Ms. Mitchell for all damages sustained due to Defendant's unlawful hiring decision and is entitled to all remedies available to her authorized by law including, but not limited to, front pay, back pay, compensatory damages, punitive damages, costs, attorneys' fees, etc.

**THIRD CLAIM FOR RELIEF**
**Age Discrimination in Violation of the ADEA, 29 U.S.C. § 621 *et seq.***

66.     Ms. Mitchell reiterates and realleges each and every paragraph above and incorporates each hereto as if set forth fully herein.

67.     At all times relevant, Ms. Mitchell constituted an "employee" within the meaning of the ADEA.

68.     At all times relevant, Defendant constituted an "employer" within the meaning of the ADEA.

69.     At all times relevant to this Complaint, Ms. Mitchell was 41 years old, and therefore met the threshold requirement of the ADEA

70.     On August 6, 2020, Ms. Mitchell applied for the Calibration Technician position within a matter of hours after Beal provided notice of the open position.

71.     Ms. Mitchell was more than qualified for the Calibration Technician position. Prior to joining the Company, Ms. Mitchell had worked in various manufacturing jobs as a temporary employee. Ms. Mitchell had worked as a Mechanical Assembler for Defendant for over a year prior to applying for the Calibration Technician position. As a Mechanical Assembler, Ms. Mitchell was responsible for *assembling* tools, *testing* the assembled product, and *troubleshooting* issues discovered during the quality control testing.  Further, in her role as a Mechanical Assembler, Ms. Mitchell had become very knowledgeable regarding the Company's products, as well as its policies and procedures. In fact, when Ms. Mitchell began working for Defendant, she

was a temporary employee; however, prior to the expiration of her contract, Defendant hired her as a full-time employee because the Company "could not afford to lose her." Ms. Mitchell was never disciplined, nor did she receive negative feedback regarding her work.

72.     Similarly, if hired for the Calibration Technician position, Ms. Mitchell would have been responsible for *assembling* systems and components and *testing* the assembled systems. Additionally, the job posting indicated that candidates for the Calibration Technician Position must possess, among others, *troubleshooting* skills. Admittedly, Defendant acknowledged Ms. Mitchell's "extensive manufacturing experience." Ms. Mitchell met (and exceeded) the requisite qualifications for the Calibration Technician position.

73.     Ms. Mitchell was not hired for the Calibration Technician position under circumstances that raise an inference of age discrimination. First, Defendant hired Sinning, an applicant in late twenties, with no prior manufacturing experience rather than Ms. Mitchell, a 41-year-old applicant with "extensive manufacturing experience." Additionally, a former Company HR manager had, prior to her departure from the Company, instructed Defendant to hire Ms. Mitchell for the Calibration Technician position because she was the most qualified candidate.

74.     The only explanation Defendant provided Ms. Mitchell regarding its decision to hire Sinning over her was because he performed a "bit better" in his interview. This explanation is wholly pretextual. During her interview, Defendant's supervisory employees did not ask Ms. Mitchell any substantive questions, let alone provide her the opportunity to present her "interview skills."  Instead, Feltenberger used the interview as an opportunity to describe the position's workload, of which Ms. Mitchell was well-aware.

75.     Defendant treated Sinning, a member outside of Ms. Mitchell's protected class of age more favorably when it offered him the Calibration Technician position. Specifically,

Defendant hired an applicant who was approximately ten (10) years younger than Ms. Mitchell even though she possessed superior knowledge of the Company's products and its assembly, manufacturing, testing and trouble-shooting procedures/protocols.

76.     In hiring Sinning, Defendant engaged in unlawful employment practices in violation of 29 U.S.C. § 621 *et. seq*. Specifically, Defendant, through its supervisory employees, discriminated against Ms. Mitchell by hiring a less qualified, younger applicant for the Calibration Technician position to which she also had applied. Further, Defendant attempted to cover up its unlawful conduct by offering to train Ms. Mitchell, without compensation, for a "second" Calibration Technician position that may never have come to fruition.

77.     By hiring Sinning over Ms. Mitchell, lying to her, and attempting to hide the intent behind its actions, Defendant, through its supervisory employees, acted intentionally, maliciously, and with reckless indifference to Ms. Mitchell's federally protected right to be free from age discrimination.

78.     Defendant's conduct, by and through its supervisory employees, deprived Ms. Mitchell of equal employment because of her age.

79.     Based on its conduct as set forth herein, it was reasonably foreseeable to Defendant that Ms. Mitchell would incur significant damages, including but not limited to lost wages, as a direct and proximate result of its unlawful hiring decision.

80.     As a direct and proximate result of Defendant's acts and omissions as set forth herein, Defendant is liable to Ms. Mitchell for all damages sustained due to Defendant's unlawful and discriminatory hiring decision and is entitled to all remedies available to her authorized by law including, but not limited to, front pay, back pay, costs, attorneys' fees, etc.

81.     As a direct and proximate cause of Defendant's violation of the ADEA as described herein, Ms. Mitchell has suffered, and continues to suffer, economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which Ms. Mitchell is entitled to an award of damages, attorney's fees, and costs.

82.     Further, the foregoing constitutes a willful violation of the ADEA within the meaning of 29 U.S.C. § 626(b) and, as a result, Ms. Mitchell is entitled to liquidated damages.

**FOURTH CLAIM FOR RELIEF**
**Retaliation in Violation of Title VII**
**Of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.***

83.     Ms. Mitchell reiterates and realleges each and every paragraph above as if set forth fully herein.

84.     On September 2, 2020, Ms. Mitchell complained about Defendant's unlawful conduct to Beal, Defendant's HR Manager, via email. Ms. Mitchell stated that it was "pure discrimination" that she was not hired for the Calibration Technician position and that she had not been give a "fair shot." Ms. Mitchell's complaint to Beal constitutes protected activity under federal law.

85.     On September 3, 2020, just one (1) day after she first complained to Beal, Ms. Mitchell was confronted by Snead, Defendant's Production Manager, in front of her co-workers while she worked on the assembly line to discuss her discrimination concerns. Snead stated that "it stood out" to him that she thought she had been discriminated against.

86.     A few days after her exchange with Snead, Ms. Mitchell was notified that a meeting had been set between she and Feltenberger, a Calibration Lab Supervisor, to "get to know one another." On September 10, 2020, eight (8) days after she complained to Beal, Ms. Mitchell met with Feltenberger. During the meeting, Feltenberger stated that the intended to meet with her once

a week to ensure she did not "start thinking crazy things." Ms. Mitchell was very intimated and uncomfortable during the meeting.

87.     On September 16, 2020, Ms. Mitchell received a notification that a meeting had been set between she, Eller, and Snead. Ms. Mitchell confided in Beal that the meetings made her uncomfortable and she felt the purpose of them was to intimidate her. Beal suggested she cancel the meeting. Ms. Mitchell did so.

88.     On September 17, 2020, Beal approached Ms. Mitchell in front of her co-workers while she worked on the assembly line and told her that she needed to meet with her the conference room. Beal then proceed to question her regarding her complaints of discrimination. Again, Ms. Mitchell reiterated her complaints. Ms. Mitchell's recitation of her complaints to Beal constitutes a protected activity under federal law.

89.     During the meeting, Beal told Ms. Mitchell that if she had not cancelled the September 16th meeting, she would have been offered a Calibration Technician position. Beal indicated she had drafted an offer letter regarding same, but Ms. Mitchell was never provided a copy.

90.     Defendant's conduct, by and through its supervisory employees and human resources personnel, adversely affected the terms and conditions of Ms. Mitchell's employment. Because she complained of discrimination, Ms. Mitchell was required to attend meetings with Company supervisors to ensure that she did not "think crazy things." Upon information and belief, no other employees were required to attend similar-type meetings. The meetings were a new term and/or condition of Ms. Mitchell's employment which did exist prior to her complaints of discrimination.

91.     Further, Defendant indicated that it decided not to offer her a Calibration Technician position when she declined to attend the September 16th meeting, which she declined upon the advice of Defendant's human resources personnel.

92.     Within one (1) week of her discrimination complaints, Defendant began to change the terms and conditions of her employment. She was required to attended meeting with Defendant's supervisory employees and, when she declined to do so upon advice of Defendant's Human Resources Manager, Defendant decided to withdraw its offer to hire her as a Calibration Technician. The temporal proximity between Ms. Mitchell's complaints of discrimination and the implementation of required meetings between Ms. Mitchell and Defendant's supervisory employees clearly demonstrates that the meetings initiated solely because she engaged in a protected activity, as described herein. Additionally, Ms. Mitchell was told that the purpose of the meetings were to ensure she did not "start thinking crazy things," which likely included that she had been discriminated against.

93.     Defendant, by and through its supervisory employees, retaliate against Ms. Mitchell by imposing new terms and condition on her employment solely because she complained about discrimination in Defendant's hiring practices.

94.     As a direct and proximate result of Defendant's retaliation as described herein, Ms. Mitchell has suffered and continues to suffer damages, including emotional distress, pain and suffering, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

95.     As a direct and proximate result of Defendant's retaliation as described herein, Ms. Mitchell is entitled to recover all damages and remedies available under the law to her including, but not limited to, front pay, back pay, compensatory damages, liquidated damages, costs, and attorneys' fees.

## JURY DEMAND

Ms. Mitchell demands a trial by jury of the claims asserted in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays the Court for judgment against Defendant to the full extent permitted by 29 U.S.C. §794(a)(1), 42 U.S.C. § 2000e-5(f)-(k) and 42 U.S.C. § 1981a, 29 U.S.C. § 626(b) including but not limited to, the following:

1.     Judgment in Ms. Mitchell's favor, determining that Defendant's actions and conduct towards and relating to Ms. Mitchell violated Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991 and the ADEA.

2.     Award Ms. Mitchell back pay of all monetary damages incurred, including but not limited to back pay, front pay, interest, and benefits.

3.     Award Ms. Mitchell damages for mental anguish, emotional distress, and other non-pecuniary damages.

4.     Award Ms. Mitchell punitive damages as a result of the intentional unlawful actions and conduct of Defendant under the Civil Rights Act of 1964 and the Civil Rights Act of 1991.

5.     Award Ms. Mitchell liquidated damages as a result of Defendant's willful violation of the ADEA in an amount to be determined at trial.

6.     Award Ms. Mitchell the costs, disbursements, expenses, reasonable attorneys' fees, and expert witness fees incurred by her in filing and prosecuting this action pursuant to 42 U.S.C. § 1981a and as may be authorized by any other applicable federal laws;

7.     For an award of pre- and post-judgment interest to Ms. Mitchell on all damages; and

8.     For all other, further relief as this Court deems just and appropriate.

This the 22nd day of September, 2021.

Respectfully submitted,

GREEN MISTRETTA LAW, PLLC

/s/ Lindsey A. Bullard
Lindsey A. Bullard, N.C. Bar No. 46664
Dawn T. Mistretta, N.C. Bar No. 31691
1752 Heritage Center Drive, Suite 101
Wake Forest, NC 27587
Telephone:     (919) 278-7453
Facsimile:      (855) 876-8893
lbullard@gmlawyers.org
dmistretta@gmlawyers.org
*Counsel for Plaintiff*